UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL ACOSTA, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>FRITO-LAY, INC., et al.,<br><br>    Defendants. | Case No. 15-cv-02128-JSC<br><br>**ORDER GRANTING PRELIMINARY APPROVAL OF CLASS AND COLLECTIVE ACTION SETTLEMENT**<br><br>Dkt. No. 68, 69 |

Truck drivers employed by Defendants Frito-Lay, Inc., FL Transportation Inc., and PepsiCo Inc. allege Defendants failed to pay minimum wages or provide meal and rest breaks. Now pending before the Court are two motions: (1) Plaintiffs' motion for preliminary approval of class and collective action settlement, and (2) Plaintiffs' motion to dismiss Greg Frye as a class representative and named plaintiff. (Dkt. Nos. 68, 69.) Having carefully reviewed the briefs and having had the benefit of oral argument on January 16, 2018, the Court GRANTS both motions.

## BACKGROUND

Plaintiffs Daniel Acosta, Jose Hernandez, Dennis Easley, Orlando Castillo, and Greg Frye filed this action in the Superior Court of the State of California for the County of San Francisco on February 25, 2015 alleging failure to provide meal rest periods, failure to pay minimum wages for all time worked, associated pay check stub and waiting time penalties, and unfair business practices. (Dkt. No. 68-2 ¶ 7.) Plaintiffs brought six claims: (1) Labor Code Sections 226.7 and 512; (2) Labor Code Section 226.7 and Section 12 of the IWC Wage Orders; (3) Failure to Pay Minimum Wage; (4) Labor Code Section 203; (5) Labor Code Section 226; and (6) California Business and Professions Code 17200 et seq. – Unfair Business Practices. (Dkt. No. 68 at 8 ¶ III. "Background and Procedural History".) On March 5, 2015, Plaintiffs filed a First Amended

1 Complaint ("FAC") alleging the same claims. (Dkt. No. 1-2 at 8.) Defendants answered the FAC on May 8, 2015 and removed the case to this district on May 11, 2015. (Dkt. No. 1, 1-2 at 59.)

On November 3, 2015, Plaintiffs' counsel moved to withdraw as counsel for named Plaintiff Greg Frye. (Dkt. No. 22.) The motion was granted on November 23, 2015. (Dkt. No. 24.) On June 7, 2016, the parties attended a full-day mediation with court-appointed mediator Arthur Siegel but were unable to reach a settlement. (Dkt. No. 68-2 ¶ 10.) The parties returned for a second mediation on April 25, 2017 with Michael Dickstein. (*Id*. ¶ 11.) After a full day of negotiations the parties reached a settlement whose terms are memorialized in the "Stipulation and Settlement of Class Action Claims" (the "Settlement Agreement"). (Dkt. No. 68-3.)

**A.     Complaint Allegations**

Plaintiffs were and are truck drivers employed by Defendants. (Dkt. No. 1-2 at 10-11 ¶ 7.) Plaintiffs work in San Francisco as well as other various counties in California. (*Id*.) Defendants pay Plaintiffs on a piece rate system based on activities such as mileage and number of cases at predetermined rates. (*Id*. at 13 ¶ 20.) When Plaintiffs report to work they are frequently required to wait, sometimes for two hours or more, for their loads to be ready. (*Id*.) Defendants do not compensate Plaintiffs for this time waiting for loads to be dispatched. (*Id*.) Further, Defendants do not compensate Plaintiffs for time spent performing necessary job duties, including but not limited to pre-trip and post-trip inspections on the tractor and trailer, fueling and washing the tractor and trailer, and filling out mandatory paperwork including hours of service logs and daily vehicle inspection reports. (*Id*.)

Defendants set Plaintiffs' work schedule, including where to report, when to show up, what loads to deliver, routes to follow, and delivery times. (*Id*.) Defendants do not schedule a time where Plaintiffs are provided an off-duty meal break or rest break. (*Id*.) Defendants have a systematic business policy and practice of scheduling Plaintiffs to work more than five hours per day without the provision of an off-duty 30 minute meal period and more than three and one half hours per day without a ten minute rest period. (*Id*. at 20 ¶¶ 46, 53.)

Some Plaintiffs were involuntarily discharged by Defendants. (*Id*. at 15 ¶ 27.) Others were constructively terminated or voluntarily terminated their employment. (*Id*.) These drivers

did not receive all pay due and owing at the time of their discharge or termination. (*Id.*) Defendants had a consistent uniform policy, practice, and procedure of willfully failing to pay the earned wages of all such former employees. (*Id.*) Defendants willfully failed to pay the earned and unpaid wages related to hours worked, meal time, break time, and timely payment of accrued vacation. (*Id.* at 15 ¶ 28.)

Defendants failed to maintain records required by Labor Code § 226. (*Id.* at 28 ¶ 84.) Defendants' pay records issued to Plaintiffs and class members do not contain the information required by the California Labor Code § 226(a)(1) through (9).[1] (*Id.*) Additionally, Plaintiffs and class members cannot easily and readily ascertain the information required by Labor Code § 226(a)(1) without reference to other documents and information. (*Id.*)

**B.    The Class**

The class consists of 254 long haul or "over-the-road" drivers employed by Defendants in California from February 25, 2011 to July 31, 2017. (Dkt. No. 68-3 ¶¶ I, K.)

**C.    Settlement Terms**

The parties agree to the certification of the class to include all Plaintiffs. (Dkt. No. 68-3 at 13 ¶ IX(2)(a).) Plaintiffs agree to file a Second Amended Complaint to add causes of action for penalties under the California Private Attorney's General Act ("PAGA") and for unpaid wages under the FLSA so that these causes of action can be settled and released through the Settlement Agreement. (*Id.* at 13-14 ¶ 3.)

---

[1] Cal. Lab. Code § 226(a)(1) through (9) requires employers to include the following information on employee paychecks: "(1) gross wages earned, (2) total hours worked by the employee, (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item, (5) net wages earned, (6) the inclusive dates of the period for which the employee is paid, (7) the name of the employee and only the last four digits of his or her social security number or an employee identification number other than a social security number, (8) the name and address of the legal entity that is the employer and, if the employer is a farm labor contractor, as defined in subdivision (b) of Section 1682, the name and address of the legal entity that secured the services of the employer, and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee and, beginning July 1, 2013, if the employer is a temporary services employer as defined in Section 201.3, the rate of pay and the total hours worked for each temporary services assignment."

The Settlement Agreement establishes a common fund of $6.5 million dollars inclusive of attorney's fees, costs and expenses, service payments to the named Plaintiffs, payment to the Labor Workforce Development Agency ("LWDA"), employee-owed taxes, and administration costs including settlement administration fees. (*Id*. at 20 ¶ 5.) The common fund shall be allocated in the following manner:

(1) $1.625 million, or 25% to Plaintiffs' counsel as a "Fee Award,"

(2) $60,000 to Plaintiffs' counsel as a "Costs Award,"

(3) $20,000 to each named Plaintiff for a total of $80,000 as a "Service Award"

(4) $50,000 representative of penalties recoverable under PAGA and payable to the LWDA, 75% or $37,500 of which will be paid to the LWDA and the remaining 25% or $12,500 will remain in the payout fund, and

(5) $15,000 for administration expenses.

(*Id*. at 21 ¶ 6.) Plaintiffs' counsel has incurred $36,000 in expenses to date. (Dkt. No. 68-2 at 12 ¶ 50.)

All class members will receive a state law award. (*Id*. at 22 ¶ 7(b).) All class members who opt into the FLSA collective action by submitting a consent form will also receive a federal law award. (*Id*.) The consent form requests Plaintiffs to provide the following information: name, address, former names (if any), the last four digits of the Plaintiff's social security number, the Plaintiff's employee ID (if known), and home and work telephone numbers. (Dkt. No. 68-5 at 3.) Instructions on how to submit the form are provided. (Dkt. No. 68-5 at 3.)

Originally, the Settlement Agreement stated that the FLSA consent form must be submitted no later than 45 days after the date the form is mailed. (Dkt. No. 68-3 at 32 ¶ IX(12)(e).) At the hearing, the Court advised the parties that 60 days would be a more reasonable window for class members to return the form given most people do not check their mail on a daily basis. The parties agreed and submitted a revised notice and an errata to the Settlement Agreement. (Dkt. Nos. 76, 77 at 3.) The revised Notice includes the changed deadline of 60 days to opt-out of the class action, opt-in to the FLSA award, or object to the settlement. (Dkt. No. 77

4

at 6 ¶¶ 2 and 3, 7 ¶ 4.) The errata for the Settlement Agreement reflects the same changes, consistent with the Notice. (Dkt. No. 76 at 2.)

All consent forms will be submitted to the settlement administrator who will certify to the counsel of both parties whether the forms were timely submitted. (*Id*. at 30 ¶ IX(12)(d)(2).) If the consent form is defective, the form will be returned to the class member who will be informed of the defect and given 15 days to return the consent form to the settlement administrator. (*Id*. at 32-33 ¶ IX(12)(e).) If the consent form is not returned within 15 days it will be untimely and rejected. (*Id*.)

Within ten days of the Settlement Agreement's effective date Defendants shall wire the settlement administrator the entire common fund amount of $6.5 million plus employer-owed taxes into a qualified settlement account set up by the settlement administrator for distribution. (*Id*. at 22 ¶ 7.) After deducting the fees award, costs award, service awards, payment to LWDA, and administration fees, the remaining amount will be labeled the "Payout Fund," the entirety of which will be distributed to the class members. (*Id*. at 22 ¶ IX(7)(b)(i).) 80% of the Payout Fund will be allocated to the payment of the state law awards. (*Id*. at 22 ¶ IX(7)(b)(ii).) All class members will receive a state award on a pro-rata basis based on the number of weeks worked compared to the number of weeks worked by all class members. (*Id*.) 20% of the Payout Fund will be allocated to the payment of federal funds. (*Id*. at 23 ¶ IX(7)(b)(iii).) Payment for federal claims shall be determined by the same pro-rata formula used for state funds. (*Id*.)

Twenty-five percent of all award payments to class members will be called the "Wage Portion" where payroll deductions will be made for state and federal withholding taxes and other payroll deductions. (*Id*. at 24 ¶ IX(7)(b)(v).) Seventy-five percent of all award payments will represent the "Non-Wage Portion" and include interest and penalties sought in the action. (*Id*.) Within 20 days of the Settlement Agreement's execution Defendants shall provide the settlement administrator with a "Class List and Data Report" identifying each Plaintiffs' name, current mailing address, telephone number, social security number, and the representative number of weeks each Plaintiff worked during the class period. (*Id*. at 26 ¶ IX(9)(a).) Defendants shall

1 provide each Plaintiff's work week information to the settlement administrator no later than 30

2 days after the close of the class period. (*Id*. at 23 ¶ IX(7)(b)(iv).)

3     The settlement administrator has the authority to make payments of all the awards set out in the Settlement Agreement. (*Id*. at 27 ¶ IX(10)(c).) The Fees, Costs, and Service Awards shall also be paid by the settlement administrator within 20 days of the effective date. (*Id*. at 24 ¶ IX(8).) "Effective Date" is defined as the date by which the Settlement Agreement is finally approved and the Court's judgment becomes final. (*Id*. at 12 ¶ IX(1).) The settlement administrator will also calculate the individual awards for the class members and shall be responsible for issuing the payments and calculating and withholding all the state and federal taxes owed by the class members. (*Id*. at 27 ¶ IX(10)(a)(b).) Checks paid to class members shall remain valid for 120 days from the date of their issuance and may thereafter be automatically canceled if not cashed. (*Id*. at 34 ¶ IX(12)(e).) The funds from voided checks shall be distributed to *cy pres* to the United Way Bay Area Matchbridge Program, an organization that supports Bay Area youth in gaining employment skills to break the cycle of poverty. (*Id*.)

### D. Release

    Class members, including named Plaintiffs, agree to release Defendants from all state and federal claims based on the facts pled in the SAC of "every nature and description whatsoever, known or unknown, asserted or that might have been asserted" that have arisen during the class period, February 25, 2011 to July 31, 2017. (*Id*. at 14-18 ¶¶ IX(4)(a)(1), 4(a)(4), 4(b)(1), 4(b)(4).) In addition to the state and federal releases by the class members, the named Plaintiffs also agree to an additional general release of all claims, known or unknown, prior to the execution of the Settlement Agreement. (*Id*. at 19 ¶ IX(4)(c).) The general release by named the Plaintiffs does not include: (1) claims that as a matter of law cannot be released, and (2) reporting any suspected whistleblower claims or participating in any proceeding before the Equal Employment Opportunity Commission, Security and Exchange Commission, or other governmental authorities. (*Id*. at 19 ¶ IX(4)(c).)

//

//

**E. Notice**

The settlement administrator is responsible for mailing the notice of settlement and the FLSA consent form described above (together, the "Notice Packet") via first class mail to Plaintiffs within 10 days of receiving the class list or after preliminary approval of the settlement, whichever is later. (*Id*. at 29-30 ¶ IX(12)(d)(1)(2).) Prior to mailing, the settlement administrator will perform a search based on the national change of address database information to update or correct any address changes, and if necessary perform skip-tracing efforts to locate Plaintiffs. (*Id*. at 30 ¶ IX(12)(d)(2).)

The notice of settlement contains: a description of the lawsuit including the allegations and claims, contact information for both Plaintiffs' and Defendants' counsel, a summary of the settlement amount outlining the state law and federal law awards, and contact information for the settlement administrator. (Dkt. No. 68-4 at 2-3.) The notice also informs Plaintiffs that they have five options: (1) do nothing and receive a state law award, (2) opt-out of the class action, including a description of the necessary language for the opt-out request, (3) opt-in to the FLSA action and receive a federal law award, (4) object to the settlement, or (5) appear at the final fairness hearing. (*Id*. at 3-5.) Plaintiffs are instructed that they may appear at the final fairness hearing in person or through an attorney. (*Id*. at 5.) The notice also lists the amount Plaintiffs' attorneys shall receive in fees and costs, the amount of the named Plaintiffs' service awards, and payments to the LWDA and the settlement administrator. (*Id*. at 5 ¶ F, G, H, I, J.)

After the hearing, at the Court's instruction, the parties added the language to the Notice regarding: (1) not opting out of the state award and opting into the federal law award results in class memberss receiving both awards, (2) the right to object to the settlement, including the amount of attorneys' fees sought, and who to serve the objection on, (3) the final approval hearing date of May 3, 2018, and (4) the date Plaintiffs will file the attorney fee motion and that a copy of the motion will be available on Plaintiffs' counsel's website. (Dkt. No. 77 at 2.)

**DISCUSSION**

A class action settlement must be fair, adequate, and reasonable. Fed. R. Civ. P. 23(e)(2). When, as here, parties reach an agreement before class certification, "courts must peruse the

proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). If the court temporarily certifies the class and finds the settlement appropriate after "a preliminary fairness evaluation," then the class will be notified and a final "fairness" hearing scheduled to determine if the settlement is fair, adequate, and reasonable pursuant to Federal Rule of Civil Procedure 23. *Villegas v. J.P. Morgan Chase & Co.*, No. 09-00261, 2012 WL 5878390, at *5 (N.D. Cal. Nov. 21, 2012).

### A. Conditional Certification of the Settlement Class

Class actions must meet the following requirements for certification: 1) the class is so numerous that joinder of all members is impracticable; 2) there are questions of law or fact common to the class; 3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and 4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

In addition to meeting the requirements of Rule 23(a), a potential class must also meet one of the conditions outlined in Rule 23(b)—of relevance here, the condition that "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In evaluating the proposed class, "pertinent" matters include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Prior to certifying the class, the Court must determine that Plaintiffs have satisfied their burden to demonstrate that the proposed class satisfies each element of Rule 23.

//

8

### 1. Rule 23(a)

The Rule 23(a) factors are satisfied. First, the 254 member estimated class satisfies the numerosity requirement. *See In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350–51 (N.D. Cal. Oct. 6, 2005) ("[w]here the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied"); *Quezada v. Con-Way Freight Inc.*, 2012 WL 4901423, at *3 (N.D. Cal. Oct. 15, 2012) (noting that generally speaking classes of more than 75 members satisfy the numerosity requirement). Second, the common questions of law and fact center around Defendants' alleged uniform course of conduct with respect to Defendants' piece rate pay system which allegedly deprived drivers of minimum wage pay, policies where drivers were not paid for rest periods, and failure to itemize paychecks satisfies the commonality requirement. *See Bellinghausen v. Tractor Supply Co.*, 303 F.R.D. 611, 616-17 (N.D. Cal. 2014) ("divergent factual predicates with shared legal issues and a common core of salient facts coupled with disparate legal remedies within the class can be sufficient"). Third, because the at-issue policies are applied across the board, all employees are alleged to have suffered similar injuries with respect to failure to pay wages and penalties, thereby meeting the typicality requirement. *Id*. at 617 ("[t]he typicality requirement is satisfied here because Plaintiff alleges that he, like the other class members, worked for Defendant in California during the class period and was subjected to the same wage-and-hour policies and procedures at issue in this litigation."); *see also Quezada*, 2012 WL 4901423, at *3 (typicality is satisfied when each member's claim arises from the same course of events and each member makes similar arguments to prove the defendant's liability). Finally, named Plaintiffs and class counsel appear adequate. Named Plaintiffs were employed by Defendant during the class period and were allegedly injured in the same way as the class members. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594–95 (1997) ("[r]epresentatives must be part of the class and possess the same interest and suffer the same injury as the class members.") Plaintiffs' counsel has litigated at least 24 class actions and lead counsel Mr. Kopfman has been practicing for over 15 years. *See* Dkt. No. 68-2 at ¶¶ 3, 4; *Andrews Farms v. Calcot, LTD*., 2010 WL 3341963, at *4 (E.D. Cal. Aug. 23, 2010) ("class counsel must be qualified, experienced, and generally able to conduct the class action litigation.").

**2. Rule 23(b)(3)**

Rule 23(b)(3) requires establishing the predominance of common questions of law or fact and the superiority of a class action relative to other available methods for the fair and efficient adjudication of the controversy. *See* Fed. R. Civ. P. 23(b)(3). Because of the common policies at issue here the Court concludes there are no predominance or superiority concerns.

a) *Predominance*

Rule 23(b)(3) first requires "a predominance of common questions over individual ones" such that "the adjudication of common issues will help achieve judicial economy." *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). This "inquiry focuses on the relationship between the common and individual issues." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (internal citation and quotation marks omitted). In particular, the predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 594. "When common questions present a significant aspect of the case and can be resolved for all members of the class with a single adjudication, there is a clear justification for handling the dispute on representative rather than on an individual basis." *Delagarza v. Tesoro Refining and Mktg. Co.*, 2011 WL 4017967, *10 (N.D. Cal. Sept. 8, 2011). The core common questions in this case—the lawfulness of Defendants' policies and practices with respect to piece-rate system, minimum wage, paystubs, and rest breaks—predominate over any differences with respect to implementation of those policies and practices. As such, the Court concludes that common questions of law and fact predominate.

b) *Superiority*

A class action is a superior means of adjudicating a dispute "[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino*, 97 F.3d at 1234. In evaluating superiority, "courts consider the interests of the individual members in controlling their own litigation, the desirability of concentrating the litigation in the particular forum, and the manageability of the class action." *Hunt v. Check Recovery Sys., Inc.*, 241 F.R.D. 505, 514 (N.D. Cal. 2007) modified, No. 05–04993 MJJ, 2007 WL 2220972 (N.D. Cal. Aug. 1,

2007), aff'd sub nom. *Hunt v. Imperial Merch. Servs., Inc.*, 560 F.3d 1137 (9th Cir. 2009). There is no indication that members of the proposed class have a strong interest in individual litigation or an incentive to pursue their claims individually, given the amount of damages likely to be recovered relative to the resources required to prosecute such an action. *See Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 379 (N.D. Cal. June 18, 2010) (evaluating superiority under Rule 23(b)(3) and noting that "the class action is superior to maintaining individual claims for a small amount of damages"). Moreover, a class action is preferred when individuals may forgo pursuing their claims due to fear of retaliation. *See Williams v. Superior Court*, 3 Cal.5th 531, 558 (2017) (concluding fear of retaliation cuts in favor of "facilitating collective actions so that individual employees need not run the risk of individual suits"). A class action is superior to other forms of litigation in this action.

Accordingly, the Court concludes that conditional class certification for settlement purposes is proper.

          c)     *Certification of FLSA Collective Action*

The FLSA provides for a private right of action to enforce its provisions "by any one or more employees for and [on] behalf of himself or themselves or other employees similarly situated." 29 U.S.C. § 216(b). "A Court has considerably less stringent obligations to ensure fairness of the settlement in a FLSA collective action than a Rule 23 action because parties who do not opt in are not bound by the settlement." *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 602, 607 (E.D. Cal. Oct. 8, 2015). Courts will approve settlements of both FLSA and Rule 23 claims only when the parties expressly allocate settlement payments to FLSA claims. *Thompson v. Costco Wholesale Corporation*, 2017 WL 697895, at *7 (S.D. Cal. Feb. 22, 2017) citing *Millan*, 310 F.R.D. at 602.

The requirements for certifying a FLSA collective action are met. The putative class members appear to be similarly situated because the FLSA claim relies on the contention that Defendants' policy—denying minimum wage—is the cause of the FLSA violation. *See Millian*, 310 F.R.D. at 607. Further, the parties have expressly allocated payment of a federal law award

11

for class members that sign the consent form and opt into the FLSA collective action. *See Thompson*, 2017 WL 697895, at *7.

Accordingly, the Court concludes that Plaintiffs' FLSA collective action is conditionally certified.

## B. Preliminary Approval of the Settlement

In determining whether a settlement agreement is fair, adequate, and reasonable to all concerned, a court typically considers the following factors: "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (quoting *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)).

However, when "a settlement agreement is negotiated prior to formal class certification, consideration of these eight . . . factors alone is" insufficient. *Id.* In these cases, courts must show not only a comprehensive analysis of the above factors, but also that the settlement did not result from collusion among the parties. *Id.* at 947. Because collusion "may not always be evident on the face of a settlement, . . . [courts] must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self- interests and that of certain class members to infect the negotiations." *Id.* In *Bluetooth*, the court identified three such signs:

> (1) when class counsel receives a disproportionate distribution of the settlement, or when the class receives no monetary distribution but counsel is amply rewarded;
>
> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorney's fees separate and apart from class funds without objection by the defendant (which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement); and
>
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

12

*Id*. The Court cannot fully assess all of these fairness factors until after the final approval hearing; thus, "a full fairness analysis is unnecessary at this stage." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 665 (E.D. Cal. 2008) (internal quotation marks and citation omitted). Instead, "the settlement need only be potentially fair, as the Court will make a final determination of its adequacy at the hearing on Final Approval, after such time as any party has had a chance to object and/or opt out." *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 386 (C.D. Cal. May 31, 2007). At this juncture, "[p]reliminary approval of a settlement and notice to the class is appropriate if [1] the proposed settlement appears to be the product of serious, informed, noncollusive negotiations, [2] has no obvious deficiencies, [3] does not improperly grant preferential treatment to class representatives or segments of the class, [4] and falls within the range of possible approval." *Cruz v. Sky Chefs, Inc.*, No. 12-02705, 2014 WL 2089938, at *7 (N.D. Cal. May 19, 2014) (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp.2d 1078, 1079 (N.D. Cal. Apr. 12, 2007)).

### 1. The Fairness Factors

#### a) *The Proposed Settlement*

This first factor concerns "the means by which the parties arrived at settlement." *Harris v. Vector Mktg. Corp.*, No. 08–5198, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011). For the parties "to have brokered a fair settlement, they must have been armed with sufficient information about the case to have been able to reasonably assess its strengths and value." *Acosta*, 243 F.R.D. at 396. Particularly with pre-certification settlements, enough information must exist for the court to assess "the strengths and weaknesses of the parties' claims and defenses, determine the appropriate membership of the class, and consider how class members will benefit from settlement" in order to determine if it is fair and adequate. *Id*. at 397 (internal quotation marks omitted).

The use of a mediator and the presence of discovery "support the conclusion that the Plaintiff was appropriately informed in negotiating a settlement." *Villegas*, 2012 WL 5878390, at *6; *Harris*, 2011 WL 1627973, at *8 (noting that the parties' use of a mediator "further suggests that the parties reached the settlement in a procedurally sound manner and that it was not the result of collusion or bad faith by the parties or counsel"). However, the use of a neutral mediator "is

13

not on its own dispositive of whether the end product is a fair, adequate, and reasonable settlement agreement." *Bluetooth*, 654 F.3d at 948.

Here, in preparation for mediation, Defendants provided Plaintiffs with the class list pursuant to stipulation and protective order. (Dkt. No. 68-2 at 6-7 ¶ 16.) The class list includes contact information for approximately 242 class members. (*Id*.) Defendants also produced databases containing the compensation paid to, as well as the recorded trip activity of, each class member. (*Id*. at 7 ¶ 17.) This data was evaluated by Plaintiffs' expert, economist Edward Garcia, for the purposes of preparing a damages model for the mediation. (*Id*.) The parties thereafter participated in an all-day mediation with an experienced mediator, and continued to work together for months after the mediation to formulate the Settlement Agreement. (*Id*. at 4 ¶ 11, 9 ¶ 34.) On balance, the settlement appears to be the product of serious, informed, non-collusive negotiations, and this factor weighs in favor of preliminary approval of the settlement.

      b) *Obvious Deficiencies*

The Court next considers "whether there are obvious deficiencies in the Settlement Agreement." *Harris*, 2011 WL 1627973, at *8. Following the hearing and the changes identified in the revised Notice and errata to the Settlement Agreement, the Court concludes there are no substantive deficiencies precluding preliminary approval.

      c) *Lack of Preferential Treatment*

Under this factor, "the Court examines whether the Settlement provides preferential treatment to any class member." *Villegas*, 2012 WL 5878390, at *7. Each proposed class member in this case may claim their pro rata share of the fund based on the number of workweeks worked during the class period, less the employee's share of required tax withholdings. The settlement further provides that the named Plaintiff will receive a $20,000 service award. "Incentive awards [as opposed to agreements] are fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). There is no evidence that named Plaintiffs and counsel agreed prior to the suit to a particular incentive agreement. Though viewed more favorably than incentive agreements, "excess incentive awards may put the class representative in a conflict with the class and present a considerable danger of individuals bringing cases as class

14

actions principally to increase their own leverage to attain a remunerative settlement for themselves and then trading on that leverage in the course of negotiations." *Id*. at 960 (internal quotation marks and citation omitted). Incentive awards "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Id*. at 958–59.

The Court will determine at the final approval hearing whether Plaintiffs' request for a $20,000 incentive award is reasonable. The Court notes, however, that Plaintiff's request for a $20,000 incentive award is higher than the amount generally awarded by courts in this district. *See, e.g., Wren v. RGIS Inventory Specialists*, No. 06– 05778, 2011 WL 1230826, at *37 (N.D. Cal. Apr. 1, 2011) (approving $5,000 incentive awards to 24 named plaintiffs in $27,000,000 settlement) supplemented, No. 06–05778, 2011 WL 1838562 (N.D. Cal. May 13, 2011); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000) (approving $5,000 to two plaintiff representatives of 5,400 potential class members in $1.75 million settlement); *Hopson v. Hanesbrands, Inc.*, No. CV–08–0844, 2009 WL 928133, at *10 (N.D. Cal. Apr. 3, 2009) (approving $5,000 award to one member of 217 member class from $408,420 settlement amount). Given there is no evidence currently before the Court regarding the involvement of the Named Plaintiffs in this case, the Court will defer its ruling until the final approval hearing on whether a $20,000 Service Award is excessive based on the work done on behalf of the class and the risk undertaken.

d) *Range of Possible Approval*

Finally, the Court must determine whether the proposed settlement falls within the range of possible approval. "To evaluate the range of possible approval criterion, which focuses on substantive fairness and adequacy, courts primarily consider plaintiff's expected recovery balanced against the value of the settlement offer." *Harris*, 2011 WL 1627973, at *9 (internal citation and quotation marks omitted).

Mr. Garcia, Plaintiffs' economic expert, used data from databases produced by Defendants to construct a damages model of approximately $6.6 million in unpaid minimum wages, $20.8

15

million in minimum wage penalties and interest, and $1.8 million for on call time. (Dkt. Nos. 68-2 at 11 ¶ 45; 68-11 at 2.) The proposed settlement represents 28.7% of the total potential damages in this case and 98.6% of the minimum wage damages. (Dkt. Nos. 68-2 at 11 ¶ 45.)

While 28.7% recovery of total potential damages or a 98.6% recovery of the minimum wage damages appears objectively fair and adequate, the actual value of the settlement cannot be accurately assessed until the claims process is completed. *Harris*, 2011 WL 1627973, at *14 (concluding "the parties and the Court will be in a position to accurately calculate the value of the settlement and compare it to the maximum damages recoverable" at the time of the final fairness hearing). Given the class participation rate will be critical to the Court's ultimate determination of whether the settlement is fair, reasonable, and adequate, the Court will defer ruling on this factor until after the fairness hearing.

### 2. Class Notice Plan

For any class certified under Rule 23(b)(3), class members must be afforded the best notice practicable under the circumstances, which includes individual notice to all members who can be identified through reasonable effort. The notice must clearly and concisely state in plain, easily understood language:

(i) the nature of the action;
(ii) the definition of the class certified;
(iii) the class claims, issues, or defenses;
(iv) that a class member may enter an appearance through an attorney if the member so desires;
(v) that the court will exclude from the class any member who requests exclusion;
(vi) the time and manner for requesting exclusion; and
(vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). "Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill*, 361 F.3d at 575 (internal quotation marks omitted).

The notice requirements are met. The notice describes the allegations and claims, a definition of the class members, contact information for both Plaintiffs' and Defendants' counsel, a summary of the settlement amount outlining the state law and federal law awards, and the contact information for the settlement administrator. Plaintiffs are informed that they may appear

16

at the final fairness hearing in person or through an attorney. The notice also describes five options, including opting-into the FLSA federal claim or opting out of the class entirely, and instructions on how to do both. Finally, the notice also informs Plaintiffs that receiving and state or federal award will release Plaintiffs of all associated claims. Accordingly, the Rule 23(b)(3) notice requirements are met.

"[I]t is the obligation of the district court to ensure that the class has an adequate opportunity to review and object to its counsel's fee motion and, potentially, to conduct discovery on its objections to the fee motion if the district court, in its discretion, deems it appropriate." *In re Mercury Interactive Corp.*, 618 F.3d 988, 995 (9th Cir. 2010). There is no "bright-line rule of a time period that would meet Rule 23(h)'s requirement that the class have an adequate opportunity to oppose class counsel's fee motion." *Id*. "[A] schedule that requires objections to be filed before the fee motion itself is filed denies the class the full and fair opportunity to examine and oppose the motion that Rule 23(h) contemplates." *Id*. Plaintiffs' counsel is instructed to file its motion for attorney's fees by March 15, 2018 in order to permit Plaintiffs plenty of time to object to the motion as required by *In re Mercury*. Plaintiffs' counsel is also ordered to list the March 15, 2018 deadline and the website where the motion can be found on the revised Notice.

Finally, the notice plan itself is adequate. Within 20 days of preliminary approval Defendant will provide the Claims Administrator with the class members' last known addresses and within 10 days of receipt of that information the settlement administrator will mail the notice packet to the class members. The settlement administrator will perform a search based on the national change of address database information to update or correct any address changes, and if necessary perform skip-tracing efforts to locate Plaintiffs.

### 3. Attorneys' Fees

"While attorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' agreement, Fed. R. Civ. Pro. 23(h), courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941. Where a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ either the

17

lodestar method or the percentage-of-recovery method. *See In re Mercury Interactive Corp.*, 618 F.3d 988, 992 (9th Cir. 2010). "Because the benefit to the class is easily quantified in common-fund settlements, we have allowed courts to award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar." *Bluetooth*, 654 F.3d at 942 (noting that 25% of the fund is considered the "benchmark" for a reasonable fee). "Though courts have discretion to choose which calculation method they use, their discretion must be exercised so as to achieve a reasonable result. Thus, for example, where awarding 25% of a 'megafund' would yield windfall profits for class counsel in light of the hours spent on the case, courts should adjust the benchmark percentage or employ the lodestar method instead." *Id*.

"The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *Id*. at 941. The resulting figure may be adjusted upward or downward to account for several factors including the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment. *Hanlon*, 150 F.3d at 1029.

The Ninth Circuit recommends that whatever method is used, the district court perform a cross-check using the second method to confirm the reasonableness of the fee, e.g., if the lodestar method is applied, a cross-check with the percentage-of-recovery method will reveal if the lodestar amount surpasses the 25% benchmark. *See Bluetooth*, 654 F.3d at 944–45.

Here, Plaintiffs' counsel seeks 25% percentage-of-recovery or $1.625 million. 25% is the benchmark the Ninth Circuit has identified for attorney's fees, therefore for the purposes of preliminary approval the Court concludes that the amount of attorney's fees is appropriate. However, in order to prevent a windfall, the Court instructs Plaintiffs' counsel to submit time records with its motion for attorney's fees, as required by Civil Local Rule 54-5(b), so that the Court can perform a lodestar analysis comparing the requested 25%, or $1.6 million, to the amount that would have been recovered by Plaintiffs' counsel's hours, as recommended by the Ninth Circuit. *See Bluetooth*, 654 F.3d at 944–45.

//

### 4. Costs

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros,* 303 F.R.D. at 375 (citations omitted). To that end, courts throughout the Ninth Circuit regularly award litigation costs and expenses—including reasonable travel expenses—in wage-and-hour class actions. *See, e.g., id.*; *Nwabueze II,* 2014 WL at 324262, *2; *LaGarde,* 2013 WL 1283325, at *13. The settlement agreement provides that Plaintiffs' counsel may obtain up to $60,000 in costs. However, Plaintiffs' counsel has represented that it has only incurred $36,000 in expenses to date. (Dkt. No. 68-2 at 12 ¶ 50.)

Plaintiffs counsel's is instructed to submit an itemized sheet summarizing its costs with its attorney's fees motion so that the Court can determine whether these costs are reasonable litigation expenses incurred for the benefit of the class. *See Harris v. Marhoefer,* 24 F.3d 16, 19 (9th Cir.1994) (noting that a prevailing plaintiff may be entitled to costs including, among other things, "postage, investigator, copying costs, hotel bills, meals," and messenger services). Given there were no depositions or motion practice but only written discovery and minimal filings, a $60,000 cost award appears high. A cost award of approximately $30,000-$40,000 rather than $60,000 is more reasonably proportionate to the amount of attorneys' fees when compared to similar settlements. *See Odrick v. UnionBancal Corp.,* 2012 WL 6019495, at *7 (N.D. Cal. Dec. 3, 2012) (awarding $20,000 in costs in conjunction with $875,000 attorneys' fees). However, for the purposes of preliminary approval the estimated costs are appropriate and the Court will defer final ruling on this issue.

### C. Motion to Dismiss Greg Frye

Mr. Frye was originally identified as a named Plaintiff in this action. (Dkt. No. 68-3 at 7-8 ¶ J.) Mr. Frye entered into a severance agreement with Defendants in 2015. (Dkt. No. 69-1 at 2 ¶ 5.) Thereafter, Plaintiffs' counsel moved to withdraw as counsel which the Court granted. (Dkt. No. 24.) Plaintiffs' counsel has not been in touch with Mr. Frye since November 2015. (Dkt. No. 69-1 at 2 ¶ 6.) The parties stipulated, as a term in the Settlement Agreement, to dismiss Mr. Frye

as a named Plaintiff. (Dkt. No. 68-3 at 7-8 ¶ J). The parties further agree Mr. Frye may remain as a class member and collect any recovery he is entitled to. (*Id.*)

The Court concludes Mr. Frye is an inadequate class representative and GRANTS Plaintiffs' motion. *See* Fed. R. Civ. Pro. 23(a)(4) (requiring that the representative parties "fairly and adequately protect the interests of the class"). In order to determine whether the adequacy prong is satisfied courts consider two questions "(1) [d]o the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class." *Staton*, 327 F.3d at 957. Here, given the severance agreement Mr. Frye executed with Defendants and his lack of involvement in this case, the Court concludes Mr. Frye has not vigorously prosecuted this action on behalf of the class. Accordingly, the Court GRANTS Plaintiffs' motion.

## CONCLUSION

As discussed above, the Court GRANTS Plaintiffs' motion for preliminary approval of the class and collective action settlement and motion to dismiss Greg Frye as a named Plaintiff and class representative. Plaintiffs' counsel is instructed to add the following two items to the Notice: (1) March 15, 2018 as the deadline for filing its attorney's fees motion, and (2) the website link where the fee motion will be available.

This Order disposes of Docket Nos. 68 and 69.

**IT IS SO ORDERED.**

Dated: January 31, 2018

JACQUELINE SCOTT CORLEY
United States Magistrate Judge