UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL ACOSTA, et al., | Case No. 15-cv-02128-JSC |
| Plaintiffs, | |
| v. | **ORDER RE FINAL APPROVAL OF CLASS AND COLLECTIVE ACTION SETTLEMENT AND ATTORNEYS' FEES** |
| FRITO-LAY, INC., et al., | |
| Defendants. | Re: Dkt. Nos. 79, 80 |

Truck drivers employed by Defendants Frito-Lay, Inc., FL Transportation Inc., and PepsiCo Inc. allege Defendants failed to pay minimum wages or provide meal and rest breaks. Approximately two years after litigation commenced, the parties agreed to settle the action on a class-wide basis. The Court granted preliminary approval of the $6,500,000 settlement. Now pending before the Court are two motions: (1) Plaintiffs' motion for final approval of class and collective action settlement, and (2) Plaintiffs' motion for attorneys' fees, litigation costs, and enhancements awards. (Dkt. Nos. 79, 80.) Having carefully reviewed the briefs and having had the benefit of oral argument on May 3, 2018, the Court GRANTS Plaintiffs' motion for final approval and GRANTS IN PART Plaintiffs' motion for attorneys' fees.

**COMPLAINT ALLEGATIONS**

Plaintiffs were and are truck drivers employed by Defendants. (Dkt. No. 1-2 at 10-11 ¶ 7.) Plaintiffs work in San Francisco as well as other various counties in California. (*Id.*) Defendants pay Plaintiffs on a piece rate system based on activities such as mileage and number of cases at predetermined rates. (*Id.* at 13 ¶ 20.) When Plaintiffs report to work they are frequently required to wait, sometimes for two hours or more, for their loads to be ready. (*Id.*) Defendants do not compensate Plaintiffs for this time waiting for loads to be dispatched. (*Id.*) Further, Defendants

1    do not compensate Plaintiffs for time spent performing necessary job duties, including but not

2    limited to pre-trip and post-trip inspections on the tractor and trailer, fueling and washing the

3    tractor and trailer, and filling out mandatory paperwork including hours of service logs and daily

4    vehicle inspection reports. (*Id.*)

5       Defendants set Plaintiffs' work schedule, including where to report, when to show up,

6    what loads to deliver, routes to follow, and delivery times. (*Id.*) Defendants do not schedule a

7    time where Plaintiffs are provided an off-duty meal break or rest break. (*Id.*) Defendants have a

8    systematic business policy and practice of scheduling Plaintiffs to work more than five hours per

9    day without the provision of an off-duty 30 minute meal period and more than three and one half

10    hours per day without a ten minute rest period. (*Id.* at 20 ¶¶ 46, 53.)

11       Some Plaintiffs were involuntarily discharged by Defendants. (*Id.* at 15 ¶ 27.) Others

12    were constructively terminated or voluntarily terminated their employment. (*Id.*) These drivers

13    did not receive all pay due and owing at the time of their discharge or termination. (*Id.*)

14    Defendants had a consistent uniform policy, practice, and procedure of willfully failing to pay the

15    earned wages of all such former employees. (*Id.*) Defendants willfully failed to pay the earned

16    and unpaid wages related to hours worked, meal time, break time, and timely payment of accrued

17    vacation. (*Id.* at 15 ¶ 28.)

18       Defendants failed to maintain records required by Labor Code § 226. (*Id.* at 28 ¶ 84.)

19    Defendants' pay records issued to Plaintiffs and class members do not contain the information

20    required by the California Labor Code § 226(a)(1) through (9).[1] (*Id.*) Additionally, Plaintiffs and

21

---

22    [1] Cal. Lab. Code § 226(a)(1) through (9) requires employers to include the following information on employee paychecks: "(1) gross wages earned, (2) total hours worked by the employee, (3) the

23    number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, (4) all deductions, provided that all deductions made on written orders of the employee

24    may be aggregated and shown as one item, (5) net wages earned, (6) the inclusive dates of the period for which the employee is paid, (7) the name of the employee and only the last four digits

25    of his or her social security number or an employee identification number other than a social security number, (8) the name and address of the legal entity that is the employer and, if the

26    employer is a farm labor contractor, as defined in subdivision (b) of Section 1682, the name and address of the legal entity that secured the services of the employer, and (9) all applicable hourly

27    rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee and, beginning July 1, 2013, if the employer is a temporary services

28    employer as defined in Section 201.3, the rate of pay and the total hours worked for each temporary services assignment."

class members cannot easily and readily ascertain the information required by Labor Code § 226(a)(1) without reference to other documents and information. (*Id*.)

## THE SETTLEMENT

**A.    General Terms**

The Settlement Agreement establishes a common fund of $6.5 million dollars inclusive of attorneys' fees, costs and expenses, service payments to the named Plaintiffs, payment to the Labor Workforce Development Agency ("LWDA"), employee-owed taxes, and administration costs including settlement administration fees. (*Id*. at 20 ¶ 5.) The common fund shall be allocated in the following manner:

(1) $1.625 million, or 25% to Plaintiffs' counsel as a "Fee Award,"

(2) $60,000 to Plaintiffs' counsel as a "Costs Award,"

(3) $20,000 to each named Plaintiff for a total of $80,000 as a "Service Award"

(4) $50,000 representative of penalties recoverable under PAGA and payable to the LWDA, 75% or $37,500 of which will be paid to the LWDA and the remaining 25% or $12,500 will remain in the payout fund, and

(5) $15,000 for administration expenses.

(*Id*. at 21 ¶ 6.) Plaintiffs' counsel has incurred $36,854.74 in expenses to date. (Dkt. No. 79-2 at 12 ¶ 41.) The firm will incur additional costs associated with travel to and attendance of the final approval hearing of approximately $3000. (*Id*.)

**B.    Class Members**

The class consists of 254 members. (Dkt. No. 80-3 at 3 ¶ 8.) No class member has objected to the terms of the settlement agreement. (Dkt. No. 80-2 at 3 ¶ 11.) Class members are entitled to a state law award and federal law award. (*Id*. at 3 ¶¶ 11, 12.) Class members will automatically receive a state law award and were required to submit a consent form to opt into the federal law award. (*Id*.) 254 class members will be paid their portion of the state law award. (Dk. No. 80-3 at 4 ¶ 14.) Of those, 224 class members returned their FLSA consent form and will receive their portion of the federal law award. (Dkt. No. 80-2 at 3 ¶¶ 12.) This represents

approximately 88% of the settlement class. (Dkt. No. 80-3 at 4¶ 13.) The work weeks claimed by the submitted consent forms constitute 97% of the total work weeks of all the class members. (*Id*.)

Originally, the Settlement Agreement stated that the FLSA consent form must be submitted no later than 45 days after the date the form is mailed. (Dkt. No. 68-3 at 32 ¶ IX(12)(e).) At the preliminary approval hearing, the Court advised the parties that 60 days would be a more reasonable window for class members to return the form given most people do not check their mail on a daily basis. The parties agreed and submitted a revised notice and an errata to the Settlement Agreement. (Dkt. Nos. 76, 77 at 3.)

**C.    Notice**

On February 1, 2018, Simpluris, Inc., the claims administrator, received the Court approved notice and claim form ("Notice Packet") from Plaintiffs' counsel. (Dkt. No. 80-3 ¶ 5.) Simpluris obtained the class list from Plaintiffs' counsel and processed and updated the mailing addresses via the National Change of Addresses Database ("NCOA") maintained by the U.S. Postal Service. (*Id*. at 3 ¶¶ 6, 7.) In the event that any class member filed a change of address request with the postal services, that address was used for the mailing of the Notice Packet. (*Id*.) After updating the addresses via NCOA, Simpluris mailed the Notice Packets via First Class Mail to the 254 members on the class list. (*Id*. at 3 ¶ 8.)

Five notices were initially returned undeliverable. (*Id*. at 3 ¶ 9.) Simpluris attempted to find a forwarding address via Accurint, "a reputable research tool owned by Lexis-Nexis." (*Id*.) Simpluris used the previous address and the class member's name to locate current addresses. (*Id*.) At the end of the process there were no undeliverable class notices. (*Id*.)

The Notice Packet advised class members of the applicable deadlines and the date of the final approval hearing, as well as how members could obtain additional information about the settlement. (*Id*. at 2 ¶ 5.) Class members were provided a Simpluris toll-free number that was accessible 24 hours a day, seven (7) days a week to make inquiries about the settlement. (*Id*. at 2 ¶ 4.) Simpluris is also maintaining a website regarding the settlement where it made available Plaintiffs' motion for attorneys' fees and costs. (*Id*. at 4 ¶ 12.)

**D.    Release**

Class members, including the named Plaintiffs, agree to release Defendants from all state and federal claims based on the facts pled in the SAC of "every nature and description whatsoever, known or unknown, asserted or that might have been asserted" that have arisen during the class period, February 25, 2011 to July 31, 2017. (Dkt. No. 68-3 at 14-18 ¶¶ IX(4)(a)(1), 4(a)(4), 4(b)(1), 4(b)(4).) In addition to the state and federal releases by the class members, the named Plaintiffs also agree to an additional general release of all claims, known or unknown, prior to the execution of the Settlement Agreement. (*Id*. at 19 ¶ IX(4)(c).) The general release by named the Plaintiffs does not include: (1) claims that as a matter of law cannot be released, and (2) reporting any suspected whistleblower claims or participating in any proceeding before the Equal Employment Opportunity Commission, Security and Exchange Commission, or other governmental authorities. (*Id*. at 19 ¶ IX(4)(c).)

**E.     Payments**

Within ten days of the Settlement Agreement's effective date Defendants shall wire the settlement administrator the entire common fund amount of $6.5 million plus employer-owed taxes into a qualified settlement account set up by the settlement administrator for distribution. (*Id*. at 22 ¶ 7.) After deducting the fees award, costs award, service awards, payment to LWDA, and administration fees, the remaining amount will be labeled the "Payout Fund," or approximately $4,686,114, Dkt. No. 80-3 at 5 ¶ 14, the entirety of which will be distributed to the class members. (*Id*. at 22 ¶ IX(7)(b)(i).) Eighty percent of the Payout Fund will be allocated to the payment of the state law awards. (*Id*. at 22 ¶ IX(7)(b)(ii).) All class members will receive a state award on a pro-rata basis based on the number of weeks worked compared to the number of weeks worked by all class members. (*Id*.) Twenty percent of the Payout Fund will be allocated to the payment of federal funds. (*Id*. at 23 ¶ IX(7)(b)(iii).) Payment for federal claims shall be determined by the same pro-rata formula used for state funds. (*Id*.)

Twenty-five percent of all award payments to class members will be called the "Wage Portion" where payroll deductions will be made for state and federal withholding taxes and other payroll deductions. (*Id*. at 24 ¶ IX(7)(b)(v).) Seventy-five percent of all award payments will represent the "Non-Wage Portion" and include interest and penalties sought in the action. (*Id*.)

The settlement administrator has the authority to make payments of all the awards set out in the Settlement Agreement. (*Id*. at 27 ¶ IX(10)(c).) The Fees, Costs, and Service Awards shall also be paid by the settlement administrator within 20 days of the effective date. (*Id*. at 24 ¶ IX(8).) "Effective Date" is defined as the date by which the Settlement Agreement is finally approved and the Court's judgment becomes final. (*Id*. at 12 ¶ IX(1).)

The settlement administrator will also calculate the individual awards for the class members and shall be responsible for issuing the payments and calculating and withholding all the state and federal taxes owed by the class members. (*Id*. at 27 ¶ IX(10)(a)(b).) Checks paid to class members shall remain valid for 120 days from the date of their issuance and may thereafter be automatically canceled if not cashed. (*Id*. at 34 ¶ IX(12)(e).) The funds from voided checks shall be distributed *cy pres* to the United Way Bay Area Matchbridge Program, an organization that supports Bay Area youth in gaining employment skills to break the cycle of poverty. (*Id*.) The total average recovery for each class member is $18,376.92 and the total highest recovery is estimated at $33,273.54. (Dkt. No. 80-3 at 5 ¶ 14.)

## PROCEDURAL HISTORY

Plaintiffs Daniel Acosta, Jose Hernandez, Dennis Easley, Orlando Castillo, and Greg Frye filed this action in the Superior Court of the State of California for the County of San Francisco on February 25, 2015 alleging failure to provide meal rest periods, failure to pay minimum wages for all time worked, associated pay check stub and waiting time penalties, and unfair business practices. (Dkt. No. 68-2 ¶ 7.) Plaintiffs brought six claims: (1) Labor Code Sections 226.7 and 512; (2) Labor Code Section 226.7 and Section 12 of the IWC Wage Orders; (3) Failure to Pay Minimum Wage; (4) Labor Code Section 203; (5) Labor Code Section 226; and (6) California Business and Professions Code 17200 et seq. – Unfair Business Practices. (Dkt. No. 68 at 8 ¶ III. "Background and Procedural History".) On March 5, 2015, Plaintiffs filed a First Amended Complaint ("FAC") alleging the same claims. (Dkt. No. 1-2 at 8.) Defendants answered the FAC on May 8, 2015 and removed the case to this District on May 11, 2015. (Dkt. No. 1, 1-2 at 59.)

The Court granted Plaintiffs' counsel's motion to withdraw as counsel for named Plaintiff Greg Frye on November 23, 2015. (Dkt. No. 24.) On June 7, 2016, the parties attended a full-day

mediation with court-appointed mediator Arthur Siegel but were unable to reach a settlement. (Dkt. No. 68-2 ¶ 10.)  The parties returned for a second mediation on April 25, 2017 with Michael Dickstein.  (*Id*. ¶ 11.)  After a full day of negotiations the parties reached a settlement whose terms are memorialized in the "Stipulation and Settlement of Class Action Claims" (the "Settlement Agreement").  (Dkt. No. 68-3.)

Thereafter Plaintiffs filed two motions: : (1) Plaintiffs' motion for preliminary approval of class and collective action settlement, and (2) Plaintiffs' motion to dismiss Greg Frye as a class representative and named plaintiff.  (Dkt. Nos. 68, 69.)  The Court granted both motions and instructed Plaintiffs' counsel to add the following two items to the Notice: (1) March 15, 2018 as the deadline for filing its attorneys' fees motion, and (2) the website link where the fee motion will be available.  Plaintiffs included the attorneys' fee motion filing deadline and the website link in the Notice Packet that was mailed to all of the class members.  (Dkt. No. 80-3 at 12.)  Plaintiffs filed their attorneys' fee motion on March 15, 2018.  (Dkt. No. 79.)  One month later Plaintiffs filed the motion for final approval of class and collective action settlement.  (Dkt. Nos. 79, 80.)

After conducting the final fairness hearing and carefully considering the terms of the settlement, the court now addresses whether this collective and class action should receive final certification; whether the proposed settlement is fair, reasonable, and adequate; and whether class counsel's request for attorneys' fees and costs, as well as an enhancement award, should be granted.

## LEGAL STANDARD

Judicial policy strongly favors settlement of class actions.  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).  "To vindicate the settlement of such serious claims, however, judges have the responsibility of ensuring fairness to all members of the class presented for certification."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  Where the "parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement."  *Id.*

The approval of a class action settlement takes place in two stages.  In the first stage of the approval process, as it did here, the Court preliminarily approves the settlement pending a fairness

hearing, temporarily certifies a settlement class, and authorizes notice to the class. *See Villegas v. J.P. Morgan Chase & Co.*, No. CV 09–00261 SBA (EMC), 2012 WL 5878390, at *5 (N.D.Cal. Nov. 21, 2012). "At the [final] fairness hearing, presently before the Court, after notice is given to putative class members, the Court entertains any of their objections to (1) the treatment of the litigation as a class action and/or (2) the terms of the settlement." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. Oct. 8, 2014) (citing *Diaz v. Trust Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989)). Following the final fairness hearing, the Court must reach a final determination as to whether the parties should be allowed to settle the class action pursuant to their agreed upon terms. *See id.*; *Telecommc'ns Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).

## DISCUSSION

### I.        Motion for Final Approval

#### A.        Final Class Certification of the Settlement Class

##### 1.        *Rule 23(a) Requirements*

Class actions must meet the following requirements prior to certification:

> 1) the class is so numerous that joinder of all members is impracticable; 2) there are questions of law or fact common to the class; 3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and 4) the representative parties will fairly and adequacy protect the interests of the class.

Fed. R. Civ. P. 23(a). These requirements are known as numerosity, commonality, typicality, and adequacy of representation, respectively. *Leyva v. Medline Industries Inc.*, 716 F.3d 510, 512 (9th Cir. 2013). The Court must determine that Plaintiffs have satisfied their burden to demonstrate that the proposed class satisfies each element of Rule 23. These requirements "demand undiluted, even heightened attention in the settlement context ... for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

In the Court's Order granting preliminary approval of the settlement, the Court found that the putative class satisfied the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a). (Dkt. No. 78 at 9.) The Court is unaware of any

changes that would alter its analysis. Plaintiffs did not indicate in their papers that any such developments had occurred and the Court has not received any communications from Defendants otherwise. (*See* Dkt. No. 80–2 ¶ 11.) Thus, all four of Rule 23(a)'s requirements have been met.

## 2. *Rule 23(b) Requirements*

In addition to meeting the requirements of Rule 23(a), a potential class must also meet one of the conditions outlined in Rule 23(b)—of relevance here, the condition that "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). In evaluating the proposed class, "pertinent" matters include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). The FLSA provides for a private right of action to enforce its provisions "by any one or more employees for and [on] behalf of himself or themselves or other employees similarly situated." 29 U.S.C. § 216(b). "A Court has considerably less stringent obligations to ensure fairness of the settlement in a FLSA collective action than a Rule 23 action because parties who do not opt in are not bound by the settlement." *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 602, 607 (E.D. Cal. Oct. 8, 2015). Courts will approve settlements of both FLSA and Rule 23 claims only when the parties expressly allocate settlement payments to FLSA claims. *Thompson v. Costco Wholesale Corporation*, 2017 WL 697895, at *7 (S.D. Cal. Feb. 22, 2017) citing *Millan*, 310 F.R.D. at 602.

In its Order granting preliminary approval of the settlement, the Court found that both prerequisites of Rule 23(b)(3) were satisfied as well as the requirements for an FLSA collective

action. (Dkt. No. 78 at 10-12.) The Court is unaware of any changes that would alter its analysis, and there was no indication in Plaintiffs' papers or at the fairness hearing that any such developments had occurred. Further, there were no objections by individual class members who claim to have an interest in controlling the prosecution of this action or related actions.

Accordingly, the Rule 23(b) and FLSA collective action requirements are met.

### 3. *Rule 23(c)(2) Notice Requirements*

Finally, if the Court certifies a class under Rule 23(b)(3), it "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Rule 23(c)(2) governs both the form and content of a proposed notice. *See Ravens v. Iftikar*, 174 F.R.D. 651, 658 (N.D. Cal. Jan 7, 1997) (citation omitted). The notice must be "reasonably certain to inform the absent members of the plaintiff class," but Rule 23 does not require actual notice. *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994).

As the settlement agreement provides, the settlement administrator, Simpluris Inc., mailed notice of the settlement to the last known address of all 254 class members contained on the class list. (Dkt. No. 80-3 at 3 ¶8.) Notice for five class members was returned undeliverable but Simpluris used the class member's name and previous address to locate a current address. (*Id*. at 3 ¶ 9.) Ultimately, there were no undeliverable class notices. (*Id*.) The Court is satisfied that this system of providing notice was reasonably calculated to provide notice to class members and was the best form of notice available under the circumstances. Further, that 88 percent of the class opted in to the FLSA settlement indicates that notice was effective.

Likewise, the notice itself clearly identifies the options available to putative class members: (1) do nothing and automatically receive a state law award, (2) opt out of the class action, (3) consent to opt-into the FLSA portion of the settlement and receive a federal law award, (4) object to the terms of the settlement or the amount of attorneys' fees, or (5) appear at the final fairness hearing. (Dkt. No. 80-3 at 11-12.) The notice also thoroughly explained the nature and mechanics of settlement. (*See id*. at 10-12.) The content of the notice is therefore sufficient to satisfy Rule 23(c)(2)(B). *See Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir.

2004) ("Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.' " (citation omitted)).

* * *

Because the settlement class satisfies Rules 23(a) and 23(b)(3), and notice was sufficient in accordance with Rule 23(c) and the FLSA collective action requirements, the Court will grant final class certification.

### B.        Approval of the Settlement

Having determined that class treatment is warranted, the Court now addresses whether the terms of the parties' settlement appears fair, adequate, and reasonable under Rule 23(e).  In making this determination, a court typically considers the following factors initially set forth in *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566 (9th Cir. 2004): "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement." *Id*. at 575. The court need not consider all of these factors, or may consider others.  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) ("The factors in a court's fairness assessment will naturally vary from case to case.").

In *Bluetooth*, the Ninth Circuit explained that when "a settlement agreement is negotiated prior to formal class certification, consideration of these eight ... factors alone is" insufficient. *Id*. In these cases, courts must show not only a comprehensive analysis of the above factors, but also that the settlement did not result from collusion among the parties.  *Id*. at 947. Because collusion "may not always be evident on the face of settlement, ... [courts] must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interest and that of certain class members to infect the negotiations." *Id*. The court identified three such signs:

(1) when class counsel receives a disproportionate distribution of the settlement, or when

the class receives no monetary distribution but counsel is amply awarded[;]

(2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds without objection by the defendant (which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class[;] and

(3) when the parties arrange for fees not awarded to revert to defendants rather than to be added to the class fund.

*Id.* (internal quotation marks and citations omitted). For the reasons stated below, a review of these factors indicates that this settlement is fair, adequate, and reasonable.

1. *The Churchill Factors*

a. Strength of Plaintiffs' Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation

One important consideration is the strength of the plaintiff's case on the merits balanced against the amount offered in the settlement. *DIRECTV*, 221 F.R.D. at 526. Although this action reached settlement before the Court had occasion to consider the merits of the claims, the Court need not reach an ultimate conclusion about the merits of the dispute now, "for it is the very uncertainty of outcome in litigation and avoidance of wastefulness and expensive litigation that induce consensual settlements." *Officers for Justice v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir.1982). To that end, there is no "particular formula by which th[e] outcome must be tested." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009); *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW-EMC, 2010 WL 1687832, at *9 (N.D. Cal. Apr. 22, 2010). Rather, the Court's assessment of the likelihood of success is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Rodriguez*, 563 F.3d at 965 (internal quotation marks omitted). "In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to a present value." *Id.*

Here, the FAC alleges Defendants failed to pay the earned and unpaid wages for hours

worked, meal time, break time, and timely payment of accrued vacation upon termination of employment, as well as associated pay check stub and waiting time penalties. (Dkt. No. 1-2 at 15 ¶ 28.) Plaintiffs allege these violations resulted in unfair competition and unfair business practices. (*Id*. at 28 ¶ 86.) While Plaintiffs believe their claims are meritorious, they concede continued litigation would present significant risks, in particular because Defendants have argued that their piece-rate-pay plan was lawful and compensated class members for all the time worked by relying on Labor Code Section 200 and Wage Order 9-2001 Section 4(b). (Dkt. No. 80-2 at 3 ¶ 16.) Plaintiffs further note that Defendants relied upon a 2013 case from the Central District which found a similar piece-rate-pay plan lawful. (*Id*. at 4 ¶ 17.) Moreover, Plaintiffs concede that recovery might be precluded because the Court could conclude, outside of the settlement context, that the case does not satisfy the Rule 23 requirements, or that one of Defendants' affirmative defenses has merit, the possible unavailability of penalty awards, and that Defendants may appeal any adverse judgment against them. (*Id*. at 4 ¶ 21.) Indeed, before settlement, Defendants argued in written correspondence that certification would not be appropriate because Plaintiffs' claims would require the determination of individual inquiries regarding different work locations, each with different pay policies. (*Id*. at 4 ¶ 19.) Outside of the settlement context, Defendants have assured Plaintiffs that they would "strenuously oppose certification." (*Id*. at 4 ¶ 18.) This case posture signals a significant risk that litigation might result in a lesser recovery for the class or no recovery at all.

In light of the risks and costs of continued litigation, the immediate rewards to class members are preferable. All class members will receive an award on a pro-rata basis based on the number of weeks worked compared to the number of weeks worked by all class members. (Dkt. No. 68-3 at 22 ¶ IX(7)(b)(ii).) The average recovery is $18,376.92. (Dkt. No. 80-3 at 5 ¶ 14.) The settlement administrator must make disbursements to the entire class within 20 days of the Court's final approval order. (Dkt. No. 68-3 at 24 ¶ IX(8).) Moreover, the benefit of receiving this money now rather than later at some unidentified and uncertain time has its own value.

Given the challenges Plaintiffs would face should this case move forward instead of resolving, in contrast to the finality and speed of recovery under the parties' agreement, this factor

13

weighs in favor of approving the settlement.

### b. Risks of Maintaining Class Action Status Throughout Trial

In considering the third factor, the Court looks to the risk of maintaining class certification if the litigation were to proceed. As discussed above, Defendants (1) have represented that they will aggressively oppose any motion for class certification, (2) contend that "Plaintiffs' claims would require the determination of numerous individual inquiries regarding the differing work locations," and (3) argue class certification would not be appropriate because it would require the examination of "hundreds of current and former drivers about how much time each driver spent performing non-driving tasks." (Dkt. No. 80-2 at 4 ¶¶ 18-20.) In light of these difficulties in certifying the class, the Court finds that this factor weighs in favor of approving the settlement.

### c. Amount Offered in Settlement

The fourth fairness factor, the amount of recovery offered, also favors final approval of the Settlement. When considering the fairness and adequacy of the amount offered in settlement, "it is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *DIRECTV*, 221 F.R.D. at 527 (citation omitted). "[I]t is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Id.* (collecting cases).

The parties have agreed that Defendant will establish a gross settlement fund in the amount of $6.5 million dollars. (Dkt No. 80-3 at 5.) After deducting the fees award, costs award, service awards, payment to LWDA, and administration fees, the remaining amount, or "Payout Fund," $4,686,114, will be paid to Plaintiffs. (*Id.* at 5 ¶ 14.) In the Court's order granting preliminary approval, the Court noted that the proposed settlement represents 28.7% of the total potential damages in this case and 98.6% of the minimum wage damages and concluded these numbers appeared "objectively fair and adequate." (Dkt. No. 78 at 16:2-5.) Plaintiffs represent that no terms have changed that require the Court to reconsider its conclusion. (Dkt. No. 80-2 at 3 ¶ 10.) Further, no class member has opted out of the settlement, and 224 members, or 88%, have opted into the federal law award. That "the overwhelming majority of the class willingly approved the

14

1  offer and stayed in the class presents at least some objective positive commentary as to its

2  fairness." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998). The Court therefore

3  concludes that the amount offered in settlement also weighs in favor of final approval.

4      In addition to affirming that the settlement amount is proper, the Court must ensure the *cy*

5  *pres* mechanism is appropriate. "To ensure that the settlement retains some connection to the

6  plaintiff class and the underlying claims....a *cy pres* award must qualify as the next best

7  distribution to giving the funds directly to class members." *Dennis v. Kellogg*, 697 F.3d 858, 865

8  (9th Cir. 2012) (internal quotations omitted). Here, the settlement agreement provides that the

9  funds from uncashed checks shall be distributed *cy pres* to the United Way Bay Area Matchbridge

10 Program, an organization that supports Bay Area youth in gaining employment skills to break the

11 cycle of poverty. (Dkt. No. 68-3 at 34 ¶ IX(12)(e).) The Matchbridge program, while noble in its

12 mission, does not meet the requirements of *cy pres*. Youth job training does not serve the statutes'

13 underlying purpose to prevent employers from violating wage and hour regulations, nor will it

14 benefit the interest of the silent class members – adult drivers who have no need for youth job

15 training. *See Dennis*, 697 F.3d at 865 (concluding a *cy pres* award must be guided by the

16 objectives of the underlying statutes and interests of the silent class members and must not benefit

17 a group too remote from the plaintiff class"). Instead, given the large awards at issue, the Court

18 concludes that the "next best" distribution method is to the California state controller so that the

19 silent class members may recover their award at a later time, if necessary.

20      Accordingly, the Court ORDERS the settlement administrator to transmit unclaimed funds

21 to the State of California Controller's Office, Unclaimed Property Fund after the checks become

22 void; checks will become void 120 calendar days after issuance.

23                    d.      Extent of Discovery Completed & the Stage of the Proceedings

24      In the context of class action settlements, as long as the parties have sufficient information

25 to make an informed decision about settlement, "formal discovery is not a necessary ticket to the

26 bargaining table." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998). Rather,

27 the court's focus is on whether "the parties carefully investigated the claims before reaching a

28 resolution." *Ontiveros*, 303 F.R.D. at 371 (citation omitted). Plaintiffs propounded and

Defendants responded to six sets of requests for document production, two sets of requests for special interrogatories, and one set of requests for admissions. (Dkt. Nos. 79-3 at 5, 9, 10; 68-3 at 9:16-18.) Defendants propounded and Plaintiffs responded to two sets of requests for production. (Dkt. No. 68-3 at 9:18-19.) Further, the parties engaged in two mediations over two years. The first mediation occurred about one year into the case, in June 2016, and the second, which was successful and led to the settlement at issue, was held in April 2017. (Dkt. No. 80 at 2 ¶ 6.) Given the parties have participated in several rounds of discovery production and two rounds of mediation, the Court concludes that the settlement is appropriate.

The Court therefore determines that the extent of discovery in this case favors the approval of the settlement.

### e. Experience and Views of Counsel

The experience and views of counsel also weigh in favor of approving the settlement. Plaintiffs' counsel has substantial experience in litigating wage and hour class actions on behalf of employees, including minimum wage, overtime, meal and rest breaks, and the failure to provide accurate or final wage statements under California law. (Dkt. No. 79-2 at 11 ¶ 40.) Plaintiffs' counsel has been named class counsel in approximately 23 class actions, and has tried two class actions in the last three years. (*Id.* ¶¶ 35, 40.) Plaintiffs' counsel is "of the opinion that the Settlement represents a fair, adequate, and reasonable compromise of class member claims that are disputed by the Defendants." (Dkt. No. 80-2 at 5 ¶ 25.) Given counsel's experience in this field, and his assertion that the settlement is fair, adequate, and reasonable support final approval of the settlement. *See Hanlon*, 150 F.3d at 1026; *Rodriguez v. West Pub. Corp.*, 2007 WL 2827379, at *8 (C.D. Cal. Sept. 10, 2007) ("The trial court is entitled to, and should, rely upon the judgment of experienced counsel for the parties.").

### f. Presence of a Government Participant

Although no government entity is a party to this action, Plaintiffs' counsel has been informed that Defendants' counsel provided notice to the United States Attorney General, as well as the Attorneys General for the relevant states, of the settlement pursuant to the notice provision of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715. (Dkt. No. 80–2 at ¶ 13.)

1    "Although CAFA does not create an affirmative duty for either state or federal officials to take any

2    action in response to a class action settlement, CAFA presumes that, once put on notice, state or

3    federal officials will raise any concerns that they may have during the normal course of the class

4    action settlement procedures." *Garner*, 2010 WL 1687832, at *14. To date, no state or federal

5    official has raised any objection or concern regarding the settlement.

6                             g.    Reaction of the Class Members

7         The settlement administrator identified 254 participating class members and ultimately

8    reported that none of the notices were returned as undeliverable. As of this date, the Court is not

9    aware of any class member who has filed an objection to the settlement or the award. Further, an

10   overwhelming majority of class members, 224 or 88%, have opted-in to receive the federal law

11   award. "Courts have repeatedly recognized that the absence of a large number of objections to a

12   proposed class action settlement raises a strong presumption that the terms of the proposed class

13   settlement action are favorable to the class members." *Garner*, 2010 WL 1687832, at *14

14   (internal quotation marks omitted); *see, e.g.*, *Ontiveros*, 303 F.R.D. at 371–72; *DIRECTV*, 221

15   F.R.D. at 529. Thus, the Court "may appropriately infer that a class action settlement is fair,

16   adequate, and reasonable when few class members object to it." *Garner*, 2010 WL 1687832, at

17   *14 (internal quotation marks and citation omitted).

18        In sum, the *Churchill* factors weigh in favor of granting Plaintiffs' motion for final

19   approval of the class action settlement.

20                          2.    *The Bluetooth Factors*

21        Given that this settlement was reached prior to class certification, the Court must look

22   beyond the Churchill factors and examine the settlement for evidence of collusion with an even

23   higher level of scrutiny. *See Bluetooth*, 654 F.3d at 946. The question here is whether the

24   settlement was the result of good faith, arms-length negotiations or fraud and collusion. *Id*. One

25   of the three warnings signs that the Ninth Circuit identified arguably is present. However, for the

26   reasons described below, even if this warning signs exists the Court finds no evidence of collusion

27   between the parties. *See Bluetooth*, 654 F.3d at 950 (noting that upon remand the district court

28   may uphold the settlement notwithstanding the presence of all three of the Bluetooth warning

                                         17

signs).

First, the Court compares the payout to the class (actual and expected) to the unopposed claim of fees by class counsel. *See Harris v. Vector Mktg. Corp.*, No. C–08–5198-EMC, 2011 WL 4831157, at *6 (N.D. Cal. Oct. 12, 2011). The notice provides that Plaintiffs are entitled to an award of attorneys' fees in the amount of 25 percent of the settlement fund; that is, $1,625,000. (Dkt. No. 80-3 at 12.) In its Order granting preliminary approval of the settlement agreement, the Court concluded the amount of attorneys' fees is appropriate because 25% is the benchmark the Ninth Circuit has identified. Further, the notice specifies that the total estimated payout to the class is $4,682,000. Compared to that figure, the $1,625,000 request for attorneys' fees is reasonable. The Court thus concludes that this Bluetooth warning sign is not present.

The second warning sign—a "clear sailing" provision—is present here: the settlement agreement states "Class Counsel will request, and Defendants will not oppose, an award of attorneys' fees ("Fees Award") of up to $1,625,000.00." (Dkt. No. 68-3 at 24:20-22.) "The very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class." *Bluetooth*, 654 F.3d at 948 (internal quotation marks omitted). "Therefore, when confronted with a clear sailing provision, the district court has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid awarding 'unreasonably high' fees simply because they are uncontested." *Id.*

The third warning sign—whether the parties have arranged for fees not awarded to the class to revert to defendants rather than be added to the class fund, *see Bluetooth*, 654 F.3d at 948—is not present here. The settlement agreement expressly states "There shall be no reversion of any portion of the Common Fund to Defendants," Dkt. No. 68-3 at 22:22-23, and that the funds from uncashed checks will be distributed *cy pres* to The United Way Bay Area Matchbridge Program, *id.* at 34:5-7.

Notwithstanding the existence of the one warning sign, the Court finds that the settlement did not result from, nor was influenced by, collusion. First, the settlement adequately satisfies the class members' claims, which is reflected in part by the absence of objections to the settlement.

18

Second, the Court finds no evidence of explicit collusion here, where the parties exchanged several rounds of discovery, and engaged in settlement discussions overseen by two different neutral mediators on two occasions before agreeing on this settlement. Plaintiffs' counsel has asserted that "the parties negotiated extensively and at arms-length" and "at all times the negotiations were adversarial and non-collusive." (Dkt. No. 80-2 at 2 ¶ 7.) Considering the scope of litigation and the nature of the negotiations process, the Court is satisfied that the settlement is the product of successful arms-length negotiations. *See Bluetooth*, 654 F.3d at 948 (holding that participation of a mediator is not dispositive, but is "a factor in favor of a finding of non-collusiveness").

* * *

The eight fairness factors suggest that the settlement is fair, adequate and reasonable, the Court is satisfied that the settlement was not the result of collusion between the parties, and there are no objections to address. For each of these reasons, the settlement agreement meets the Rule 23(e) requirements and final approval is appropriate.

## II.     Motion for Attorneys' Fees, Costs, and Enhancement Fee

Next, the Court must determine whether the requested attorneys' fees and expenses, the settlement administrator cost, and the class representative's incentive award and enhancement are fair and reasonable. For the reasons set forth below, the Court will award the full amount of fees and costs sought, but will reduce the amount of incentive award that Plaintiffs seek.

### A.     Attorneys' Fee Award

#### 1.     *Reasonableness of the Percentage*

As discussed above and in the Court's previous order, the Ninth Circuit has regularly approved a "benchmark" award of 25 percent of the common fund. *Bluetooth*, 654 F.3d at 947; *Staton*, 327 F.3d at 952; *Hanlon*, 150 F.3d at 1011; *Six (6) Mexican Workers*, 904 F.2d at 1311. Indeed, federal courts "have consistently approved of attorney fee awards over the 25% benchmark[,]" specifically at a rate of "30% or higher[.]" *In re Heritage Bond Litig.*, No. 02–ML–1475 DT, 2005 WL 1594403, at *18 n. 12 (C.D. Cal. June 10, 2005). Here, the settlement agreement provides that class counsel shall receive 25% percent of the gross settlement amount—

i.e., $1.625,000 of the $6,500,000 common fund.

Class counsel agreed to accept this matter on a contingency fee basis. (Dkt. No. 79-2 at 14¶ 52.) With respect to the contingent nature of this litigation, courts tend to find above-market-value fee awards more appropriate given the need to encourage counsel to take on contingency-fee cases for plaintiffs who otherwise could not afford to pay hourly fees. *See*, *e.g.*, *In re WPPSS Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994). This is especially true where, as here, class counsel has significant experience in the particular type of litigation at issue; in such contexts, courts have sometimes awarded even more than the 25 percent benchmark percentage of the common fund. *See In re Heritage Bond Litig.*, 2005 WL 1594403, at *19 (awarding attorneys' fees in the amount of 33 percent of the common fund). Moreover, when counsel takes cases on a contingency fee basis, and litigation is protracted, the risk of non-payment after years of litigation justifies a significant fee award. *See id.* Thus, that class counsel had significant experience in this field and took on this matter on a contingency fee basis indicates that the 25 percent benchmark fee request is reasonable.

The results obtained and amount of work counsel performed on this case also support a benchmark 25 percent award of attorneys' fees. *See Hensley v. Eckerhart*, 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (noting that the "most critical factor" to the reasonableness of an attorney fee award is "the degree of success obtained"). According to Plaintiffs' damages expert, the settlement represents nearly 29% of the total potential damages and nearly 87% of the minimum wage damages. (Dkt. No. 79-2 at 13 ¶ 46.) Class counsel achieved this result prior to class certification and after several rounds of discovery. The settlement will provide an average of $18,376.92 per class member. (Dkt. No. 80-3 at 5 ¶ 14.) The Court concludes that this result renders the 25 percent benchmark attorneys' fee award reasonable.

Finally, "[t]he existence or absence of objectors to the requested attorneys' fee is a factor in determining the appropriate fee award." *In re Heritage Bond. Litig.*, 2005 WL 1594403, at *21 (citation omitted). Here, Plaintiffs received notice of their right to object to the 25 percent attorney fee award, as the notice states "You also have the right to object to the amount of the attorney fees requested by Plaintiffs' attorneys." (Dkt. No. 80-3 at 12.) Not a single class member

objected. (Dkt. No. 80–2 at 3 ¶ 11.) The absence of objections or disapproval by class members to a 25 percent fee supports the finding that Plaintiffs' request is reasonable.

All of the above factors indicate that class counsel's request for attorneys' fees in the amount of 25 percent of the common fund—i.e., $1,625,000—is reasonable. Nevertheless, the Court will cross-check the requested fees against the lodestar.

### 2. *Lodestar Cross-Check*

The Court now compares the benchmark amount to the lodestar, as calculation of this amount, "which measures the lawyers investment of time in the litigation, provides a check on the reasonableness of the percentage award." *Vizcaino*, 290 F.3d at 1050. "The 'lodestar' is calculated by multiplying the number of hours ... reasonably expended on the litigation by a reasonable hourly rate." *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996).

"In determining the reasonable hourly rate, the district court should be guided by the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210–11 (9th Cir. 1986), amended on other grounds by 808 F.2d 1373 (9th Cir. 1987). The relevant community for the purposes of determining the prevailing market rate is generally the "forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008). In terms of the reasonable amount of time spent, the Court should only award fees based on "the number of hours reasonably expended on the litigation" and should exclude "hours that are excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 433–34. "There is no precise rule or formula for making these determinations[,]" and "[t]he court necessarily has discretion in making this equitable judgment." *Id.* at 436–37.

The Court shall proceed to (a) determine whether the hourly fee rate that led to that lodestar amount is reasonable, (b) address the number of hours billed, and (c) compare the lodestar amount to the percentage-amount sought to determine whether it is reasonable in light of the lodestar.

### a. Reasonable Rate

"The first step in the lodestar analysis requires the court to determine a reasonable hourly

rate for the fee applicant's services. This determination involves examining the prevailing market rates in the community charged for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Cotton v. City of Eureka*, 889 F.Supp.2d 1154, 1167 (N.D. Cal. 2012) (internal quotation marks and citation omitted); *see also Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008). The "relevant community" for the purposes of determining the reasonable hourly rate is the district in which the lawsuit proceeds. *Barjon v. Dalton*, 132 F.3d 496, 500 (9th Cir. 1997).

Here, class counsel seeks reimbursement for six attorneys with ranging levels of experience, all of whom work for the Wagner, Jones, Kopfman, and Artenian law firm: Mr. Andrew Jones, who acquired his J.D. in 1977, at a rate of $890 per hour; Mr. Lawrence Artenian, who received his law degree in 1981, at $830 an hour; Mr. Nicholas Wagner, who obtained his J.D. in 1983, at a rate of $830 an hour, Mr. Daniel Kopfman, who acquired his J.D. in 1997, at a rate of $730 per hour; Ms. Angela Martinez, who graduated from law school in 2014, at a rate of $410 an hour, and Ms. Laura Brown, a 2015 law school graduate, at a rate of $330 an hour. (Dkt. No. 79-2 at 19:1-11.) All six attorneys have asserted that their requested rates are reasonable based on rates recently awarded in wage-and-hour actions in this district; specifically, their rates are the same as those that were approved by the Honorable Susan Illston last year. (*See* Dkt. No. 79-2 at 19 ¶ 68) (citing *Ridgeway et al. v. Wal-mart Stores et al.*, Case No. 3:08-cv-05221-SI, Dkt. No. 606 at 7:1-9.)[2] In *Ridgeway*, Plaintiffs' counsel filed the Declaration of Richard M. Pearl in support of the plaintiffs' motion for attorneys' fees in that case. The Court has compared the rates in *Ridgeway* to the rates requested here by Plaintiffs' counsel and concludes that the rates requested in the instant case are in fact identical to the rates that Judge Illston concluded were reasonable in *Ridgeway*.

Further, Plaintiffs argue that their rates are in line with the rates found reasonable in comparably difficult and complex litigation. After doing its own independent review of recent

---

[2] Plaintiffs' request for judicial notice of the Pearl Declaration filed in the *Ridgeway* case is granted. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (a court may take judicial notice of "matters of public record").

wage and hour cases in this district, the Court agrees.  *See Sillah v. Command International Security Services*, Case No. 14-cv-01960-LKH, 2016 WL 692830, at *2 (N.D. Cal. Feb. 22, 2016) (concluding $331 an hour was reasonable for a third year associate); *Roberts v. Marshalss of CA, LLC*, Case No. 13-cv-04731-MEJ, 2018 WL 510286 (N.D. Cal. Jan. 23, 2018), at *14-15 (N.D. Cal. June 22, 2017) (approving rates between $300 and $750 per hour).

Based on the fees regularly awarded in comparable actions in this District, the Court concludes that Plaintiffs' rates are reasonable.

### b.    Reasonable Hours

Plaintiffs hours are also reasonable.  The majority of hours were billed by Mr. Kopfman who is lead class counsel.  Mr. Kopfman billed approximately 610 hours over three years.  (Dkt. No. 79-2 at 19:1-11.)  Mr. Wagner billed 208 hours, Mr. Jones billed 99.5 hours, Ms. Martinez billed approximately 73 hours, Mr. Artenian billed roughly 69 hours, and Mr. Brown billed 47.2 hours.  (*Id*.)  Each of the four partners submitted a declaration as well as a summary of their hours. (Dkt. Nos. 79-2, 79-3, 79-4, 79-5, 79-6.)  Mr. Kopfman has also attached charts reflecting Ms. Martinez's and Ms. Brown's time.  (Dkt. No. 79-3 at 42-49.)  After a careful review of the sworn declarations and time sheets that counsel submitted describing each of their tasks, and in light of the complex nature of a class action lawsuit and the favorable result obtained, the Court accepts Plaintiffs' counsel's explanation of their hours as reasonable.

### c.    Lodestar Calculation

Multiplying the reasonable hourly rates that Plaintiffs' counsel reports by the number of hours reasonably billed, the lodestar calculation is $838,270.07.  (Dkt. No. 79-2 at 20 ¶ 72.)  After determining the lodestar, the Court divides the total fees sought by the lodestar to arrive at the multiplier.  *See Hopkins v. Stryker Sales Corp.*, No. 11–CV–02786–LHK, 2013 WL 496358, at *4 (N.D.Cal. Feb. 6, 2013) (citation omitted).  "The purpose of this multiplier is to account for the risk Class Counsel assumes when they take on a contingent-fee case."  *Id*. (citation omitted).  If the multiplier falls within an acceptable range, it further supports the conclusion that the fees sought are, in fact, reasonable.  *Id*.  In determining whether a multiplier is appropriate, courts consider the following factors:

(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Id.* (citations omitted). "Multipliers of 1 to 4 are commonly found to be appropriate in complex class action cases." *Hopkins*, 2013 WL 496358, at *4 (citation omitted); *see also Vizcaino*, 290 F.3d at 1051 n. 6 (finding that, in approximately 83 percent of the cases surveyed by the court, the multiplier was between 1.0 and 4.0 with a "bare majority ... 54% ... in the 1.5—3.0 range").

Here, based on the lodestar amount of $838,270.07, if the Court were to grant Plaintiffs' counsel's request for a 25 percent award, the multiplier would be 1.94. In light of the results of this action, the contingent nature of counsel's fee arrangement, the skill required in conducting this litigation, and succeeding in settlement, the Court believes that the 1.94 multiplier—at the lower end of the Ninth Circuit's scale—is appropriate. *See Vizcaino*, 290 F.3d at 1051 n. 6. This is especially true given that the percentage sought is at the presumptively reasonable benchmark amount in this Circuit. Thus, the attorneys' fees requested are reasonable and the Court will award class counsel the $1,625,000 it seeks.

### B. Litigation Costs

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros*, 303 F.R.D. at 375 (citations omitted). To that end, courts throughout the Ninth Circuit regularly award litigation costs and expenses—including reasonable travel expenses—in wage-and-hour class actions. *See, e.g., id.*; *Nwabueze II*, 2014 WL at 324262, *2; *LaGarde*, 2013 WL 1283325, at *13. The settlement agreement provides that class counsel may obtain up to $60,000 in costs. Here, appointed class counsel has submitted a list of itemized costs totaling $36,854.74 relating to this litigation, ranging from filing and printing fees, to costs associated with hiring an economic expert consultant and two private mediators, to hotels and travel costs associated with court appearances in San Francisco. (Dkt. No. 79-2 at 24-27.)

At the final approval hearing, Plaintiffs' counsel represented that the court call costs amounted to $120 dollars rather than $344 dollars. Plaintiffs also seek costs for Mr. Wagner's appearance telephonically and Mr. Kopfman's in person appearance for the final approval hearing. Mr. Wagner represented the court call cost was $86. Mr. Kopfman represented that his mileage was $210 and his hotel fee was $530.54. Therefore, with these adjustments, the Court calculates Plaintiffs' request for costs as $37,457.28

These are reasonable litigation expenses incurred for the benefit of the class. *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (noting that a prevailing plaintiff may be entitled to costs including, among other things, "postage, investigator, copying costs, hotel bills, meals," and messenger services). Moreover, these costs are reasonably proportionate to the amount of attorneys' fees when compared to similar settlements. *See, e.g., Odrick v. UnionBancal Corp.*, No. C 10–5565 SBA, 2012 WL 6019495, at *7 (N.D. Cal. Dec. 3, 2012) (awarding $20,000 in costs in conjunction with $875,000 attorneys' fees); *Tarlecki v. Bebe Stores, Inc.*, No. CV–05–1777 MHP, 2009 WL 3720872, at *6 (N.D. Cal. Nov. 3, 2009) (awarding $30,000 in costs in conjunction with $200,000 in attorneys' fees). The Court therefore will grant Plaintiffs' counsel's request for compensation in the amount of $37,457.28.

## C.     Administration Costs

The Settlement calls for payment of class administration fees from the Common Fund. Plaintiff submits the declaration of Christina Francisco, a case manager employed by Simpluris, who provides detailed descriptions of the work that Simpluris did in this case as well as the work it will do if the settlement is approved. (Dkt. No. 80–3.) Simpluris obtained the class list from Plaintiffs, mailed out the Notice Packet to all 254 class members, tracked down new addresses, and made 93 phone call attempts to class members regarding the consent form submissions. Simpluris will also calculate the individual settlement payments, mail the settlement checks, and answer any questions from the class members, should they arise. Simpluris represents that $11,386 covers the "total cost for services in connection with the administration of this Settlement, including fees incurred and anticipated future costs for completion of the administration." (Dkt. No. 80-3 at 5 ¶ 18.) Courts regularly award administrative costs associated with providing notice

to the class. *See, e.g., Odrick*, 2012 WL 6019495, at *7. The Court therefore concludes that Simpluris's costs were reasonably incurred for the benefit of the class and awards the full amount sought.

### D. Incentive Award

Finally, Plaintiffs request that each of the four named Plaintiffs receive an incentive award of $20,000 to "compensate them for their time, expenses, and service to the Class." (Dkt. No. 79-1 at 18:6-9.)

"Incentive awards are fairly typical in class action cases." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). However, the decision to approve such an award is a matter within the Court's discretion. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000). Generally speaking, incentive awards are meant to "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaking in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958–59. The Ninth Circuit has emphasized that "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives. *Radcliffe v. Experian Info. Solutions, Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013) (internal quotation marks and citation omitted). In determining whether an incentive award is reasonable, courts generally consider:

> (1) the risk to the class representative in commencing a suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation; and (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.

*Covillo v. Specialtys Café*, No. C–11–00594-DMR, 2014 WL 954516, at *7 (N.D. Cal. Mar. 6, 2014) (citing *Van Vranken v. Atl. Richfield Co.*, 901 F.Supp. 294, 299 (N.D.Cal.1995) (citations omitted)).

A class representative must justify an incentive award through "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to justify the discrepancy between [his] award and those of the unnamed plaintiffs." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008). In this district, a $5,000 payment is

presumptively reasonable. *See, e.g., Burden v. SelectQuote Ins. Servs.,* No. C 10–5966 LB, 2013 WL 3988771, at *6 (N.D. Cal. Aug. 2, 2013); *Hopson v. Hanesbrands, Inc.,* No. CV–08–0844, 2009 WL 928133, at *10 (N.D.Cal. Apr. 3, 2009). Incentive awards typically range from $2,000 to $10,000. *See, e.g., Covillo,* 2014 WL 954516, at *8 (ordering an $8,000 incentive award for each of the three named plaintiffs); *Wolph v. Acer Am. Corp.,* No. 09–01314 JSW, 2013 WL 5718449, at *6 (N.D. Cal. Oct. 21, 2013) (ordering a $2,000 incentive award for each named plaintiff); *Chu v. Wells Fargo Invs., LLC,* Nos. C 05–4526-MHP, C 06–7924-MHP, 2011 WL 672645, at *5 (N.D. Cal. Feb. 16, 2011) (awarding a $10,000 incentive award to two named plaintiffs). Higher awards are sometimes given in cases involving much larger settlement amounts. *See Chu,* 2011 WL 672645, at *5 (collecting cases); *see, e.g., Glass v. UBS Fin. Servs.,* No. C–06–4068-MMC, 2007 WL 221862, at *16–17 (N.D. Cal. Jan. 26, 2007) (approving a $25,000 incentive award to four plaintiff representatives in a $45 million settlement); *Van Vranken,* 901 F.Supp. at 299 (approving $50,000 award in $76,723,213.26 settlement amount). Incentive awards are particularly appropriate in wage-and-hour actions where plaintiffs undertake a significant "reputational risk" by bringing suit against their former employers. *Rodriguez,* 563 F.3d at 958–59.

Here, Plaintiffs request a $20,000 award. This award is nearly four times the amount that is deemed presumptively reasonable in this District. *See, e.g., Burden,* 2013 WL 3988771, at *6; Hopson, 2009 WL 928133, at *10.

In support of their argument that this $20,000 award is appropriate, each of the four named Plaintiffs has submitted a declaration that outlines the work they have done on this case. (Dkt. Nos. 79-7, 79-8, 79-9, 79-10.) The declarations address the factors the Court must consider in determining the reasonableness and appropriateness of an incentive award. *See Covillo,* 2014 WL 954516, at *7. Mr. Jose Hernandez asserts that after filing the lawsuit his manager called him into his office to investigate whether Mr. Hernandez was in the country legally in order to leverage evidence that might reflect poorly on Mr. Hernandez's credibility. (Dkt. No. 79-7 ¶ 8.) Mr. Hernandez was also accused of sexual assault and harassment in the workplace, but when Mr. Hernandez inquired who made the complaint his employer refused to tell him. (*Id.*) This ordeal

was extremely embarrassing and the investigation that followed blemished Mr. Hernandez's reputation, even though the claim was completely discredited. (*Id*.) Mr. Orlando Castillo, a friend and colleague of Mr. Hernandez, was afraid that he too would be subjected to similar treatment for participating in the lawsuit. (Dkt. No. 79-9 ¶ 8(c).)

In terms of the amount of time and effort contributed to the litigation, all four Plaintiffs represent that they engaged in meetings, discussed employer policies and practices, responded to written discovery, assisted in document review, attended the two mediations, and facilitated settlement by reviewing the terms and providing feedback to Plaintiffs' counsel. (Dkt. Nos. 79-7 ¶ 11; Dkt. Nos. 79-8 ¶ 9, 79-9 ¶ 11, 79-10, Exhibit A.) Mr. Hernandez spent approximately 121 hours on this matter and drove his own vehicle approximately 1270 miles to attend meetings and the mediations in San Francisco. (Dkt. No. 79-7 ¶ 12.) Mr. Dennis Easley estimates that he spent approximately 78 hours on this litigation, $300 of his own money, and has driven his vehicle 435 miles to attend meetings and mediations. (*Id*. ¶ 10.) Mr. Castillo estimates he spent 100 hours and drove 500 miles. (Dkt. No. 79-9 ¶ 12.) Mr. Acosta, the case liaison, spent approximately 448 hours on the litigation and has submitted an exhibit reflecting all of his hours. (Dkt. No 79-10 ¶ 14.) Mr. Acosta represents he spent approximately $1,381 on behalf of the class and drove his own vehicle approximately 1,499 miles from Modesto to meet with his attorneys in Fresno, attend the mediations in San Francisco, and attend the hearing for the motion for preliminary approval. (*Id*. ¶ 12.)

Having reviewed the declarations, the Court finds that a substantial incentive award is appropriate here in light of the time and effort Plaintiffs expended for the benefit of the class—at times, to their own personal detriment—and the risks associated with initiating the litigation and representing the class. Mr. Hernandez and Mr. Castillo initiated this action as current employees and are still employed by Defendant. And Mr. Acosta spent the most time on the case. Accordingly, the Court will award Plaintiffs Hernandez, Castillo and Acosta each a $15,000 incentive award and Plaintiff Easley an award of $10,000. These amounts are less than the average recovery per class member and reasonable given the risks and time invested.

## CONCLUSION

For the reasons described above, the Court GRANTS Plaintiffs' motion for final approval of the parties' settlement. In addition, the Court GRANTS IN PART Plaintiffs' motion for attorneys' fees, costs, and incentive award. Specifically, the Court awards the following costs: $1,625,000 in attorneys' fees; $37,457.28 in litigation costs; $11,386 to the settlement administrator, Simpluris Inc.; $15,000 each to Plaintiffs Hernandez, Castillo and Acosta, and $10,000 to Plaintiff Easley as class representatives. The Court further ORDERS the settlement administrator to transmit unclaimed funds to the State of California Controller's Office, Unclaimed Property Fund.

This Order disposes of Docket Numbers 79 and 80.

**IT IS SO ORDERED.**

Dated: May 4, 2018

*Jacqueline Scott Corley*
JACQUELINE SCOTT CORLEY
United States Magistrate Judge